# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

DAVID R. BENNETT,

                              Plaintiff,

            -v.-                                         5:15-CV-140
                                                        (MAD/ATB)
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

HOWARD D. OLINSKY, ESQ., Attorney for Plaintiff
ANDREEA LECHLEITNER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT and RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the

Honorable Mae A. D'Agostino, United States District Court Judge pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with

General Order 18.

## I.    PROCEDURAL HISTORY

On September 21, 2006, plaintiff filed an application for Disability Insurance

Benefits ("DIB"), alleging disability beginning June 20, 2005 due to a right shoulder

injury, a left arm injury, and a lower back injury. (Administrative Transcript ("T.") 88,

114, 452). The application was denied initially on February 9, 2007. (T. 42). Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ"), which was held on

February 19, 2009. (T. 14-35). On March 24, 2009, ALJ Marie Greener found plaintiff

was not disabled. (T. 43-52). The ALJ's decision became the Commissioner's final

decision when the Appeals Council denied plaintiff's request for review on May 27,

2011. (T. 1-7, 495-502).

Plaintiff filed a federal action pursuant to 42 U.S.C. § 405(g), challenging the Commissioner's May 27, 2011 final decision. *Bennett v. Astrue*, 5:11-CV-795 (GTS/ RFT). On January 27, 2012, the court issued an order remanding the action to the Commissioner pursuant to the stipulation of the parties. (T. 520-22). On March 13, 2012, the Appeals Council issued an order, vacating the Commissioner's decision and remanding the case to the ALJ for a "reevaluation of the claimant's impairments." (T. 526-28).

At the end of its March 13, 2012 order, the Appeals Council also noted that plaintiff filed a subsequent, separate application for DIB, which was granted after a hearing before "an" ALJ.[1] (T. 528). The ALJ granted plaintiff's application with an onset date of March 25, 2009. (*Id.*) The Appeals Council affirmed the ALJ's favorable decision. (*Id.*) The Appeals Council ordered that "[u]pon remand, the Administrative Law Judge will consider the additional evidence submitted with the subsequent claim and obtain testimony from a medical expert to address the issue of onset of disability prior to March 25, 2009 in accordance with Social Security Ruling 83-20."[2] (*Id.*)

On April 1, 2013, ALJ Greener held a new hearing pursuant to the Appeals Council order, at which plaintiff and a vocational expert testified. (T. 478-94). In her decision, dated May 30, 2013, ALJ Greener found that plaintiff was not disabled prior

---

[1] The ALJ was Robert Gale.

[2] Social Security Ruling ("SSR") 83-20 is entitled "Title II and XIV: Onset of Disability." This ruling provides the guidance for the ALJ's determination of an onset date in various factual situations.

to March 25, 2009. (T. 449-77).  ALJ Greener's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on December 12, 2014. (T. 434-37).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment

3

which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  **FACTS**

Plaintiff's brief includes a detailed summary of the medical records and the hearing testimony. (Pl.'s Br. at 3-9) (Dkt. No. 12). Defense counsel has incorporated the plaintiff's statement of facts, except for any "inferences or conclusions asserted therein." (Def.'s Br. at 1) (Dkt. No. 13). Defense counsel has also incorporated the ALJ's statement of the case. Based on the parties' agreement, the court will also incorporate the plaintiff's statement of the facts into this decision. Rather than reciting all the medical and testimonial evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff, and with any

exceptions as noted.

## IV.  **ALJ'S DECISION**

After reviewing the extensive procedural history of this action, the ALJ stated

that the period "at issue before me is limited to the alleged onset date of June 30, 2005

through March 24, 2009." (T. 452-53).  In addition to her review of the evidence

already in the record and the testimony of the VE who appeared at the April 1, 2013

hearing, ALJ Greener obtained the services of Charles J. Hancock, M.D., an

independent medical expert.  Dr. Hancock was asked to review the evidence and

complete a set of interrogatories regarding plaintiff's impairments and their affect on

his abilities during the specific period at issue. (T. 453).  Dr. Hancock submitted his

responses to the interrogatories on November 27, 2012. (T. 665-67).  Dr. Hancock also

submitted a physical Medical Source Statement (RFC evaluation), which also pertained

only to the relevant time period. (T. 658-63).  At the request of plaintiff's attorney,

plaintiff's testimony at the supplemental hearing was limited to an explanation of his

work activity.  The ALJ also introduced the transcript of the February 2009 hearing into

evidence. (T. 453).

At step one of the disability analysis, the ALJ found that, although there was

"significant" work activity after the alleged onset date, the record did not clearly

establish that plaintiff engaged in "substantial gainful activity" during the period in

question. (T. 455).  At step two, the ALJ found that from June 20, 2005 until March 24,

2009, plaintiff had the following severe impairments: non-dominant left upper

extremity disorder status post open reduction and internal fixation of the left forearm in

6

2000; history of lumbar discectomy and decompression in October 2001; thoracic scoliosis; and work-related injury to the cervical spine on June 20, 2005 with greater occipital neuralgia. (T. 456). The ALJ found that plaintiff had various impairments that were not severe, and the ALJ discussed this determination at length. (T. 457-59). At the end of the severity analysis, the ALJ noted that in her March 24, 2009 decision, she found that plaintiff's only "severe" impairments were his cervical and thoracic spine disorders. However, a "de novo" review of all the medical evidence, including the records received after her March 24, 2009 decision, led ALJ Greener to find the additional severe impairments listed above. ALJ Greener also specifically stated that in her ultimate RFC determination, she considered both the severe and non-severe impairments.[3]

At step three of the disability analysis, ALJ Greener found that plaintiff did not have any impairment or combination of impairments that met or equaled the severity of a Listed Impairment. (T. 459-60). The ALJ considered Listings 1.02 (Major Dysfunction of a Joint); 1.04 (Disorders of the Spine); 1.07 (Fracture of an Upper Extremity); 14.09 (Inflammatory Arthritis); "near listings under 1.00 for musculoskeletal impairments;" 11.00 (Neurological Disrorders); and 14.00 (Immune System). (T. 460). The ALJ analyzed each listing and cited to her basis in the record for finding that plaintiff did not meet the requirements of each one.

---

[3] ALJ Greener also pointed out that "only the claimant's cervical and lumbar spine disorders were found to be medically determinable severe impairments in the fully favorable Administrative Law Judge decision for the period beginning on March 25, 2009." (T. 459).

Relevant to plaintiff's argument herein,[4] the ALJ found that, although plaintiff was diagnosed and treated for pain in his cervical, thoracic, and lumbar spine, his impairments did not result in "significant and persistent disorganization of motor function under Listing 11.00C, or the ability to ambulate effectively, as described in 1.00B2b." (T. 460). The ALJ found that even though plaintiff had "some mild limitation in his ability to stand or walk for prolonged periods," he could otherwise stand or walk in combination for up to six hours in an eight-hour day. (*Id.*) He did not require an assistive device for support when walking, and "repeat" laboratory testing failed to establish evidence of nerve root compression, spinal arachnoiditis, stenosis resulting in pseudoclaudication, ankylosis, or repeated manifestations of inflammatory arthritis. (*Id.*)

The ALJ also noted that the combination of plaintiff's spine disorders and upper extremity disorder did not result in an inability to perform fine and gross manipulation as required in 1.00B2c. While the plaintiff had some difficulty using his left dominant upper extremity, none of the relevant activities were precluded. (*Id.*) Plaintiff was generally able to perform activities which required good use of both his upper extremities, such as dressing, bathing, working as an auto technician doing oil changes and transmission work in 2005 and 2008, and writing. (*Id.*)

ALJ Greener found that from June 20, 2005 until March 24, 2009, plaintiff had the RFC to perform light work with "additional exertional and non-exertional

---

[4] The court will not repeat each listed impairment discussed by the ALJ, but will note that she discussed each of the above listings and cited to evidence which she believed precluded plaintiff from meeting that listing.

limitations." (T. 461). The ALJ found that plaintiff could occasionally lift, carry, push, or pull 20 pounds and frequently lift, carry, push, or pull 10 pounds. He could stand or walk, in combination for six hours in an eight-hour workday, "with standing or walking limited to 1 hour at one time and then needed to sit for 5-10 minutes before he could resume standing or walking." (*Id.*) Plaintiff could sit for six hours total in an eight-hour workday, with sitting limited to one hour at one time, and then he needed to stand or walk for 5-10 minutes before he could resume sitting. He could occasionally climb, balance, stoop, crouch, or crawl, but could never climb ladders or scaffolds, work at unprotected heights, or use tools that vibrated. (*Id.*)

In making her RFC determination, the ALJ first considered plaintiff's credibility, finding that, although his medically determinable impairments could reasonably be expected to cause the symptoms he alleged, the plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were "not entirely credible." (T. 461-62). In addition to the lack of clinical findings, the ALJ cited the following facts in support of her credibility determination: plaintiff's "limited" use of medication and the course of his medical treatment from the alleged onset date until March 24, 2009; adequate control of his pain with "daily medication" and periodic injections; failure to seek treatment in the emergency department or inpatient hospitalization for uncontrolled symptoms;[5] no record of ongoing complaints of medication side-effects; plaintiff's ability to generally perform activities requiring good use of both of his upper

___

[5] The ALJ noted that in the past, plaintiff did not hesitate to seek intensive treatment and went to the emergency room in December of 2006 for evaluation of his non-severe thyroid condition. (T. 462).

extremities; and plaintiff's ability to work on various occasions during the period in question as an auto technician, requiring him to lift greater than 20 pounds and stand for a majority of the day. The ALJ also listed inconsistencies in plaintiff's testimony as bases for discounting his credibility. (T. 462-64).

The ALJ then discussed the medical evidence, citing the reports and the weight that she gave each of them. (T. 465-67). The ALJ gave "little weight" to reports, authored by treating physicians Dr. Jeffrey Christenson, D.O. and Dr. Stephen Robinson, M.D.,[6] one of plaintiff's orthopedic physicians.[7] (T. 465-66). On May 7, 2009 (after the onset date established by ALJ Gale), Dr. Robinson stated that plaintiff's condition was guarded, and he could never lift or carry *any weight*. (T. 465) (citing T. 423, 426). Instead, the ALJ gave "greater weight" to the 2007 consultative medical opinion by Dr. Kalyani Ganesh because it was more consistent with the record in its entirety. (T. 466). ALJ Greener also found that Judge Gale's finding of disability did not influence ALJ Greener's decision because "later-dated exams support greater clinical findings consistent with the later onset date of March 25, 2009 . . . ." (T. 463).

---

[6] The notes from Syracuse Orthopedic Specialists ("SOS") by Dr. Robinson and Dr. John Fatti, M.D. (a hand specialist) are often co-signed by Terri Doolitle, RN/NP. (*See e.g.* T. 360, 363, 370). NP Doolittle also signed a "Disability-Work-School Status" document, dated September 11, 2008, which stated that plaintiff could **work** with no heavy or repetitive activities with the left upper extremity "until further notice," but then stated that plaintiff could not lift more than five pounds with his left upper extremity. (T. 286).

[7] ALJ Greener also stated that she was not giving "controlling weight" to any conclusion by plaintiff's neurologist, Dr. Saad George Sohby, who "[a]t various times," indicated that plaintiff was "temporarily totally disabled" or "totally disabled," because such a determination is reserved to the Commissioner and ALJ Greener still considered any specific functional limitations that were stated in the reports. (T. 465).

The later medical reports took into account "the greater clinical findings" noted by Dr. Ganesh and other examiners after March 24, 2009. (*Id.*) The ALJ found that plaintiff's condition became worse after March 24, 2009. The ALJ also considered and gave "some weight" to Dr. Hancock's report. (T. 464) (citing T. 658-68).

After analyzing all the evidence, ALJ Greener found that plaintiff was capable of performing a limited range of light work during the period from June 2005 through March 24, 2009, but was unable to perform any of his past relevant work because he could not lift the appropriate amount of weight. (T. 467). Because plaintiff's ability to perform the full range of light work was impeded by additional exertional and non-exertional limitations, the ALJ called VE Linda Vause to testify at the supplemental hearing. (T. 468). Based on a hypothetical question which included all the additional limitations, the VE found that there were still other jobs that plaintiff could have performed during the period between June 5, 2005 and March 24, 2009. (T. 468). Therefore, the ALJ found that plaintiff was not disabled during this closed period.

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.   The ALJ's finding that plaintiff was not disabled prior to March 25, 2009 is not supported by substantial evidence. (Pl.'s Br. at 10-16) (Dkt. No. 12).

2.   The ALJ's finding that plaintiff did not meet Listing 1.04 is not supported by substantial evidence. (Pl.'s Br. at 17-19).

3.   The ALJ erred in failing to include limitations on reaching in the RFC evaluation. (Pl.'s Br. at 20-21).

4.      The ALJ's credibility determination is not supported by substantial evidence. (Pl.'s Br. at 21-23).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Dkt. No. 13). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## VI.    LISTED IMPAIRMENT[8]

### A.    Legal Standards

At step three of the disability analysis, the ALJ must determine if plaintiff suffers from a listed impairment. *See* 20 C.F.R. §§ 404.1520, 416.920. It is the plaintiff's burden to establish that his or her medical condition or conditions meet *all* of the specific medical criteria of particular listed impairments. *Pratt v. Astrue,* 7:06-CV-551, 2008 WL 2594430 at *6 (N.D.N.Y. 2008) *(*citing *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990)). If a plaintiff's "impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify." *Id.* In order to demonstrate medical equivalence, a plaintiff "must present medical findings equal in severity to all the criteria for the *one* most similar listed impairment." *Sullivan*, 493 U.S. at 531 (emphasis added).

### B.    Application

Plaintiff argues that he meets Listing 1.04 because he exhibits evidence of radiculopathy that involves a cervical nerve root, and he meets all the other criteria of

---

[8] This is not plaintiff's first argument; however, because the Listing determination is an earlier step in the disability analysis, the court will consider the Listing argument before plaintiff's other arguments which relate to subsequent steps.

Listing 1.04. As stated above, in her decision, ALJ Greener considered several Listings in addition to Listing 1.04. Listing 1.04 is entitled "Disorders of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, [or] vertebral fracture." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. In addition, the relevant section of the listing requires

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

*Id.* Plaintiff argues that "while objective imaging does not clearly and irrefutably establish nerve root compression, the other evidence of radiculopathy does support that there was involvement of a cervical nerve root, which the ALJ did not address." (Pl.'s Br. at 17).

As defendant points out, although plaintiff had some symptoms associated with the listing, Dr. Sobhy found in September of 2005, that plaintiff's muscle tone was normal without rigidity, spasticity or atrophy. (T. 221). Plaintiff's deep tendon reflexes were 2+ equal and symmetrical. A variety of tests were all negative for nerve root compression. (T. 221). Plaintiff was able to walk on his tip toes, heel walk, and squat without difficulty. (*Id.*) Dr. Sohby's November 14, 2005 report contained similar findings. (T. 223). On November 14, 2005, Dr. Sohby reported that motor nerve conduction studies produced "no evidence of neuropathy, radiculopathy, plexopathy or myopathy." (T. 224).

On January 18, 2007, Dr. Ganesh found that plaintiff's motor strength was full in the lower extremities and full or slightly diminished in the upper extremities. (T. 241). Dr. Ganesh also found that plaintiff had no muscle atrophy, joint effusion, inflammation, or joint instability. (T. 241). Straight leg raising was negative bilaterally. (*Id.*) On February 7, 2007, Dr. Christenson stated that plaintiff "denied any" musculoskeletal symptoms. (T. 319). There was no tenderness on examination of plaintiff's neck, sensation was grossly intact to light touch, he had normal posture, and deep tendon reflexes were 2+ bilaterally. (T. 320). On July 2, 2007, Dr. Sohby found that manual muscle testing showed marked reduction in the force of contraction of all muscles of both upper limbs secondary to pain inhibition. (T. 268). Sensations were reduced in a patchy non-specific dermatomal pattern over both upper limbs, however, Dr. Sohby told plaintiff that he should increase his activity level which would benefit him as a form of physical therapy. (T. 268).

X-rays of plaintiff's cervical spine taken in September of 2008 showed "some mild disc space narrowing at C6-7 with anterior osteophyte formation." (T. 365). There was normal alignment and only mild left-sided foraminal narrowing at C7. The right neural foramen were patent. (*Id.*) The impression was "degenerative changes centered around C7. . . ." (*Id.*) On September 24, 2008, plaintiff's treating physician, Dr. Christenson stated that there was no instability in plaintiff's spine, his motor strength was "intact," and his range of motion was full with pain on extremes. (T. 307). Plaintiff's upper extremity grip strength was "slightly" decreased in his left versus his right hand. (*Id.*) On September 26, 2008, Dr. Christenson stated that plaintiff's motor

strength was "intact." (T. 305). "Neuro" examination was "grossly wnl [within normal limits]." (*Id.*)

On October 20, 2008 and November 7, 2008, Dr. Robinson found plaintiff's motor examination "normal bilaterally in both upper extremities." (T. 341, 347). Foraminal compression[9] was negative bilaterally.[10] (*Id.*) Plaintiff's range of motion was 50 degrees right and left rotation; 10 degrees extension; and 30 degrees of flexion. (*Id.*) The December 8, 2008 report "supervised" by Dr. Robinson states that plaintiff's spinal alignment was normal, there was moderate tenderness along the midline at C7 and diminished ROM in bilateral rotation and extension, but his motor exam was normal except for his left biceps which was 4/5. (T. 338-39). The sensory examination of his right arm was normal. Although the examination of his left arm showed diminished sensation, plaintiff's upper extremity reflexes were normal and symmetric. (T. 339). Additionally, in September of 2008, plaintiff was working at a light duty job, even

---

[9] Foraminal compression, also known as "Spurling's Test" is an orthopedic test to diagnose nerve root compression. *See e.g.* A Systematic Review of the Diagnostic Accuracy of Provocative Tests of the Neck for Diagnosing Cervical Radiculopathy, www.ncbi.nlm.nih.gov/pmc/articles/PMC 2200707.

[10] On December 8, 2007, the compression test was positive with plaintiff's head tilted to the left. (T. 338). It is unclear whether the test was performed by Dr. Robinson or the nurse practitioner because even though the report is electronically signed by Dr. Robinson, the report states that he was the "supervising" physician and the two "providers" listed were Linda Selinsky, FNP BC and Sonja Newsome, M.A. (T. 337, 338). In one paragraph of this report, it states that the plaintiff has parasthesias, and in another paragraph, it states that plaintiff denied parasthesias. (T. 338). Even after plaintiff's onset date, Dr. Ganesh continued to find negative straight leg raising, noted no motor deficits, and no muscle atrophy. (T. 419). Strength in the right upper extremity was 5/5 and in the left upper extremity, strength was 4/5. Clearly, there were conflicts in the evidence regarding nerve root involvement and its effect on plaintiff's ability to function. Conflicts in the evidence are for the Commissioner to resolve. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (genuine conflicts in the medical evidence are for the Commissioner to resolve).

though he testified that he had to quit working after four months because of his neck condition.[11] (T. 485).

Finally, on November 30, 2012, medical expert Dr. Hancock reviewed plaintiff's medical records and found that plaintiff did not meet a listed impairment during the time at issue. (T. 666). Thus, although plaintiff may have, at various times, have exhibited some of the symptoms and signs associated with a listed impairment, he did not exhibit all of them, and the ALJ had substantial evidence supporting his finding that plaintiff did not meed Listing 1.04,[12] particularly given Dr. Hancock's retrospective opinion that a listing was not met.

## VII. RFC/TREATING PHYSICIAN/WEIGHT OF THE EVIDENCE

### A. Legal Standards

#### 1. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an

---

[11] A listed impairment is automatic disability, and indicates that a claimant cannot perform "any" gainful activity. Plaintiff's ability to perform some work functions and to work for a few months during 2008 belies his claim of having a Listed Impairment from June of 2005 until March 24, 2009.

[12] Plaintiff argues that the nerve conduction study from October 30, 2008 showed impaired conduction in various cervical nerves, and that the ALJ should have addressed this issue. However, as stated above, the fact that plaintiff has one or more requirements of a listed impairment does not require additional analysis because the plaintiff must have all of the signs and symptoms of a listed impairment. Even if plaintiff had nerve root involvement, which is not clear, and was contradicted by various tests, the doctors cited above still found plaintiff to have intact reflexes and motor strength.

equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2.    Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating

physician's opinion is contradicted by other substantial evidence, the ALJ is **not** required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Weight of the Evidence

In making his determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.* In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

## B. Application

Although the ALJ found that plaintiff could do "light work" during the period in question, she included many additional limitations to plaintiff's RFC before asking the VE to opine as to whether there would have been work available that plaintiff could have performed between June of 2005 and March 24, 2009. The ALJ incorporated many of the limitations cited by plaintiff's treating providers that were also consistent with plaintiff's own testimony. Plaintiff does not question the ALJ's assessment of plaintiff's ability to sit, stand, and walk because the ALJ found that plaintiff could only perform these activities for one hour at a time before he needed to change positions.[13] The plaintiff argues instead, that the ALJ should have included a restriction on plaintiff's ability to use his arms and his left wrist. (Pl.'s Br. at 20). Plaintiff also argues that the ALJ should have included limitations related to reaching bilaterally and handling with his left arm.

The ALJ did consider potential limitations associated with plaintiff's left arm, but did not incorporate them into the RFC. The ALJ stated that early medical opinions, which were submitted in support of a prior finding of disability, and which found that the use of plaintiff's left arm was limited, were written soon after plaintiff's car accident in 2000.[14] Subsequent records show that plaintiff's condition improved such

---

[13] Plaintiff testified during his 2009 hearing that he could sit, stand, or walk for about an hour and one half before having to rest. (T. 25-27).

[14] Plaintiff had a prior "closed period" of disability after a car accident in 2000. (T. 452) (citing T. 36-41). The prior closed period was from April 19, 2000 until January 17, 2002 and involved the limited use of his left arm.

that he was able to return to work as an auto technician, requiring him to lift and carry fifty or more pounds. (T. 466-67).

In making her current RFC determination, the ALJ gave greater weight to Dr. Ganesh's 2007 examination, in which Dr. Ganesh found only a "moderate" limitation for sitting, standing, walking, climbing, lifting, carrying, pushing, pulling, and bending. (T. 241). Plaintiff had full range of motion of the left shoulder. His right shoulder forward elevation and abduction was 90 degrees, and his right adduction, internal, and external rotation were full. He had full range of motion in his elbows, except the left elbow supination was "slight[ly]" restricted to 75 degrees." (T. 240). He had full range of motion in his forearms, and right wrist, but no range of motion in his left wrist. He had full range of motion in his fingers bilaterally. His proximal strength was 4/5, distal was 5/5, his left proximal was 5/5, and his left distal was 4/5. (T. 241). He had no muscle atrophy, even though he had decreased pinprick sensation in the left forearm. His reflexes were equal. (*Id.*) There were no limitations stated on his ability to reach.[15]

The ALJ gave little weight to the opinions of Dr. Robinson and Dr. Christenson and Ms. Doolittle's assessment. The ALJ noted that Dr. Christenson's 2008 RFC evaluation noted that plaintiff could rarely lift ten pounds and could only sit, stand, or walk for less than two hours in an eight hour day. (T. 465). However, the ALJ stated that the RFC form completed by Dr. Christenson on September 24, 2008 indicated that

---

[15] Although not relevant to his ability to reach, the court notes that plaintiff also full range of motion in his hips other than right abduction which was limited to 20 degrees by pain. He had full range of motion in his knees and ankles bilaterally, no muscle atrophy, even though he had decreased pinprick sensation in both lower extremities and his ankle jerks were absent. (T. 241).

many of the restrictions were "per pt. [patient]," including critical functions such as sitting, standing, or walking and how many days the plaintiff was "likely to be absent from work." (T. 465) (citing T. 259-60). Even Dr. Christenson's 2010 RFC (after plaintiff's disability onset date) indicates that some information was "per patient." (T. 429).

The ALJ discounted Dr. Robinson's May 7, 2009 RFC evaluation which was written two months after ALJ Gale found that plaintiff was disabled beginning March 24, 2009. The ALJ found that Dr. Robinson's May 7, 2009 report deserved little weight in the determination of plaintiff's RFC during the period at issue. In 2009, Dr. Robinson indicated that plaintiff should never lift or carry any amount of weight. Dr. Robinson stated that the plaintiff's condition was guarded, and that plaintiff had additional limitations in looking down, turning his head, looking up, holding his head in a static position. (T. 465).

However, in his May 2009 RFC evaluation, other than mentioning plaintiff's old wrist injury, Dr. Robinson did not indicate that plaintiff had any limitation in using his hands, fingers, or reaching, including reaching overhead. (T. 427). The form completed by Dr. Robinson specifically asks whether the patient has "significant" limitations reaching, handling or fingering. (*Id.*) Dr. Robinson did not check either "yes" or "no" for the answer. (*Id.*) If the answer had been "yes," the following question asks the doctor to indicate the percentage of the day that the patient could use his arms for grasping, fine manipulation, and reaching - including overhead reaching. (*Id.*) Dr. Robinson also left this section blank.

In addition, from June to August 2008, plaintiff was working as an auto technician, in a light duty position. Plaintiff even testified that he was able to lift approximately 3-4 pounds, which is more than Dr. Robinson's statement that plaintiff could not lift or carry *any* weight. Thus, Dr. Robinson's and Dr. Christenson's RFC evaluations are inconsistent with the record and inconsistent with plaintiff's own assessment of his limitations during the period in question.[16] Thus, the ALJ's decision not to put any limitations on plaintiff's reaching was supported by substantial evidence, and he gave appropriate weight to the medical reports in the record.

The RFC evaluations, authored after March 24, 2009 were also given little weight relative to the period at issue because they took into consideration additional findings cited by Dr. Ganesh in his May 15, 2009 RFC. (T. 417-20, 463). Plaintiff argues that because there was no "traumatic event" or sudden change that led to the established onset date, it is logical that evidence after March of 2009 is pertinent to analyzing the severity and continuity of plaintiff's impairments present before that date. (Pl.'s Br. at 14). However, the court notes that Dr. Ganesh's 2009 RFC included symptoms and signs that he did not find in 2007. In his 2009 RFC report, he found reduced sensation in plaintiff's right (dominant) arm and no sensation in his left arm. There were no deep tendon reflexes in both upper extremities, he could not heel-toe walk, and there were significant strength deficits in his lower body.

Finally, plaintiff argues that the ALJ could not find that plaintiff could perform

---

[16] The ALJ discounted Ms. Doolittle because, as an NP, she is not an acceptable medical source.

light work, when she found that plaintiff could only do sedentary work in her prior opinion. The court would point out that only the lifting/carrying requirements were used from the light work category in the current RFC. When the ALJ proposed her current RFC to the VE, there were many additional limitations placed on plaintiff's exertional abilities, which would account for any previous finding that plaintiff would have to sit for the majority of the day. On the surface, it may seen "inconsistent" for the ALJ to have found that plaintiff was limited to sedentary work in her previous opinion, while she found that plaintiff could perform "light" work in her current decision. However, when one reviews the limitations that the ALJ included in the hypothetical question to the VE, it is clear that the ALJ is not finding that plaintiff could perform a full range of light work, and that the limitations could be included in the sedentary work category, other than the lifting requirements. In addition, in this record, the ALJ had the medical expert's opinion that plaintiff could perform "light" level lifting. (T. 658). Thus, the ALJ's RFC determination is supported by substantial evidence.

## VIII. CREDIBILITY

### A. Legal Standards

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the

substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function. 20 C.F.R. § 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929(c)(3).

### B. Application

Plaintiff argues that the ALJ's credibility determination is not supported by substantial evidence because the ALJ improperly relied upon plaintiff's ability to work

in 2008 as a basis for rejecting plaintiff's credibility while failing to adequately describe such work. (Pl.'s Br. at 21-23). Plaintiff states that the ALJ's "first error" was to point to "the fact that [plaintiff] was able to return to work where he lifted 50 pounds and stood the majority of the workday after recovering from his 2000 motor vehicle accident and subsequent back surgeries." (Pl.'s Br. at 22) (citing T. 466-67). Plaintiff then states that "while this is accurate, this job description is for the work Plaintiff performed prior to 2005, not the work he did in 2008, and therefore, it has no bearing on this claim wherein Plaintiff is alleging disability beginning in June 2005." (*Id.*)

Plaintiff's argument is misplaced. The ALJ stated that the plaintiff "worked on various occasions after the alleged onset date as an auto technician, which required him to stand or walk for the majority of his workday and lift greater than **20 pounds**." (T. 462) (emphasis added). While the ALJ's decision first cites to work "from July 5, 2004 to August 5, 2005, the exhibits cited by the ALJ ask about work that plaintiff performed after June 5, 2005, his alleged onset date. (*See e.g.* T. 114,[17] 220[18]). The ALJ also cited to documents showing that on September 11, 2008, during one of his orthopedic

---

[17] The ALJ cites to Ex. B-3E at 2, which corresponds to T. 114. This document is plaintiff's Disability Report, in which he answers the question "When did your illnesses, injuries, or conditions first interfere with your ability to work?" He answered "June 20, 2005." The following questions ask whether plaintiff worked after that time, and if so, whether his injuries caused a change in his work duties. Plaintiff answered that he did work, but that he was "given light duty work and my hours were from full time to four hours a day." (T. 114).

[18] The ALJ cites to Ex. B-5F, which corresponds to T. 220. This page of the record is part of a report by Dr. Sohby, plaintiff's neurologist, in which the doctor states that plaintiff "works as an auto technician. He was on light duty from June 29 until August 4, when he was taken out of work and has been out of work until the present time." (T. 220). This report is dated September 30, 2005, and although there are no years listed in the paragraph cited above, it is apparent the the doctor is referring to 2005. Thus, the ALJ is citing to work that plaintiff performed during the period in question.

appointments, plaintiff reported that he was "a mechanic," and was "working at this time at regular duty." (T. 462) (citing inter alia Ex. B-41-F p.12, T. 709).

The ALJ's citation to these records, contrary to what plaintiff appears to argue, was only to point out that "his activities of daily living have, at least at times, been somewhat greater than was alleged by the claimant." (T. 463). The ALJ never stated that plaintiff was able to lift 50 pounds during the period in question. In fact, the ALJ was careful to state that the plaintiff's activities did not "clearly rise to the level of SGA," and that the ALJ was citing these facts as some of the bases for his credibility finding.

Later in her decision, the ALJ discusses the fact that plaintiff returned to his regular job in which he had to lift 50 pounds after recovering from his motor vehicle accident in January of 2000. (T. 466-67). The ALJ cited this fact in his discussion of Dr. Ganesh's 2000 opinion and Dr. Fatti's 2002 opinion which found that plaintiff had a permanent loss of function of his left arm to about 60%. (T. 466). The ALJ simply noted that those reports were accorded "little weight" in determining plaintiff's ability to function during the relevant time period because they were rendered close to the time of plaintiff's accident, and "[s]ubsequent records show that the claimant's condition clearly improved such that he was able to return to SGA work activity as an auto mechanic that required him to stand or walk for the majority of the work-day and lift and carry 50 pounds or more." (T. 467). This was not part of the ALJ's credibility determination. It was part of the analysis of the weight that he gave to reports of

plaintiff's alleged loss of function in his left arm.[19]

With respect to his credibility analysis, the ALJ also cited the plaintiff's limited use of medication and the course of his medical treatment during the period in question. The ALJ noted that plaintiff did not return to see his orthopedic specialist until September of 2005, and that his symptoms were adequately controlled with the use of daily medication and periodic injections. (T. 462). The ALJ noted that plaintiff participated in physical therapy, but sought little other pain management treatment, occupational therapy, massage, chiropractic care, or any other alternative treatment modalities.[20]

Plaintiff's attempt to get other treatment to relieve his symptoms and any other measures taken by plaintiff to relieve symptoms are both proper considerations under the credibility analysis cited above. The ALJ noted that plaintiff was also "generally able" to perform activities that required good use of both of his upper extremities. (T. 462). The ALJ also noted that the plaintiff's complaints of impaired sleep, insomnia, fatigue, and the need to nap during the day were "overstated." (T. 462). There were no ongoing complaints to his physicians or treatment for negative side effects from his

---

[19] Because plaintiff argues that the ALJ should have included plaintiff's alleged difficulty reaching and using his arms, it was important for the ALJ to include a discussion of these reports and why he gave them little weight. The ALJ also noted that plaintiff's January 2007 function report was "legible and appears to have been handwitten by the plaintiff." (T. 462). The ALJ cited this fact to show that plaintiff could still properly use his hands for "activities that require good use of both of his upper extremities," including handwriting, personal hygiene, dressing, and working as an auto technician doing oil changes and transmission work. (T. 462).

[20] On January 19, 2009, plaintiff told a nurse practitioner that "as long as he is attending PT, his neck is ok." (T. 334).

medications, and there were no specific attempts made by his doctors to further evaluate or treat his excessive the plaintiff's complaints of chronic fatigue, oversedation, or daytime sleepiness. (T. 462).

The ALJ also cited the plaintiff's subjective complaints of pain or tenderness with decreased range of motion of his spine and left upper extremity, but noted that there were few other positive clinical findings that were "noted on repeat physical examinations." (T. 463). In a very long paragraph, the ALJ cited the variety of inconsistent findings regarding plaintiff's alleged limitations and the lack of positive clinical findings to support the severity of his limitations. (T. 463-64). Thus, the ALJ properly considered plaintiff's credibility in determining his RFC for the period in question.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and plaintiff's complaint be **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 18, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge